CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
8/18/2022
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

UNITED STATES OF AMERICA
*ex rel.* Jessica Patterson and
Autumn Williams,

and

COMMONWEALTH OF VIRGINIA,
*ex rel.* Jessica Patterson and
Autumn Williams,

Plaintiffs,

v.

1ST ADULT & PEDIATRICS
HEALTHCARE SERVICES, INC.
(f/k/a 1st ADULT N PEDIATRICS
HEALTHCARE SERVICES, INC.),

Defendant.

Civil Action No. 6:19cv00068

**COMPLAINT IN INTERVENTION OF THE UNITED STATES OF AMERICA AND THE COMMONWEALTH OF VIRGINIA**

The United States of America and the Commonwealth of Virginia ("the Commonwealth") (collectively, "the Government") bring this action against Defendant 1st Adult & Pediatrics Healthcare Services, Inc. (formerly known as 1st Adult N Pediatrics Healthcare Services, Inc.) (hereinafter "1st Adult" or "Defendant"), to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, the Virginia Fraud Against Taxpayers Act ("VFATA"), VA. CODE ANN. § 8.01-216.1 *et seq*., the Virginia Medicaid Fraud Statute, VA. CODE ANN. § 32.1-312, and the common law remedies of unjust enrichment, payment by mistake, and common law fraud for engaging in a scheme from at least January 1, 2017 through May 1, 2021,

to submit false claims for in-home health, personal care, and related services[1] to the Virginia Department of Medical Assistance Services ("DMAS"), resulting in reimbursement under the Virginia Medicaid Program totaling millions of dollars to which the Defendant was not entitled and which, to date, the Defendant has not returned.

Specifically, the Defendant engaged in several fraudulent schemes to bill Virginia Medicaid for services that were not provided to some of Virginia's most vulnerable citizens, including children and young adults with severe medical issues that necessitated extensive in-home nursing, personal care, and related services. The Defendant's fraudulent practices included, *inter alia*, (1) billing Virginia Medicaid for thousands of hours of in-home health and related services that 1st Adult's own records indicate were never actually provided; (2) billing Virginia Medicaid for in-home health and related services that 1st Adult could not have provided because the recipients of that supposed care were hospitalized; and (3) creating or attempting to create false records to perpetuate the fraud, both at the time of the fraud and upon commencement of an investigation by the Government. Specifically, after the Government initiated its investigation, the Defendant and/or employees or agents of the Defendant repeatedly attempted to obtain signatures from the parents of Medicaid beneficiaries to falsely reflect that children received care from 1st Adult that was not actually provided. The Defendant and/or employees or agents of the Defendant also created "Audit Logs" reflecting thousands of hours of billed (but undocumented) care, yet the Defendant did not promptly return payments received in connection with these "missing" records as required by law. Finally, the Government has received information indicating

[1] For purposes of this Complaint, any reference to home health and related services is meant to describe, without limitation, all of the care services provided by 1st Adult to Virginia Medicaid recipients, including but not limited home health care, nursing care, personal care, personal assistance, and/or respite care services as discussed herein.

that the Defendant and/or employees or agents of the Defendant affixed false signatures to many patient records and created "contemporaneous notes" of care that never actually occurred.

As detailed below, the Defendant received millions of dollars in payments from Virginia Medicaid by virtue of its fraudulent schemes and placed dozens of Virginia's most vulnerable and needy children and young adults at risk of serious bodily harm or even death.

## I. JURISDICTION AND VENUE

1. This action is to redress violations of the FCA, 31 U.S.C. § 3729 *et seq*. as well as the Commonwealth's sister fraud statute, the VFATA, VA. CODE ANN. § 8.01-216.1 *et seq*. The Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), because the Defendant transacts business in this District, and because the Defendant submitted or caused to be submitted claims for payment to the United States and the Commonwealth for services allegedly rendered in this District. The Defendant also received payments from the United States and the Commonwealth for those services allegedly rendered in this District.

2. The Court has subject matter jurisdiction over this action and the original action filed by Relators pursuant to 28 U.S.C. §§ 1331 and 1345.

3. This Court has jurisdiction over the Commonwealth's VFATA and other state law claims pursuant to 31 U.S.C. § 3732(b), because the violations of state and federal law arise from the same transactions or occurrences as an action brought under 31 U.S.C. § 3730, as well as supplemental jurisdiction to entertain the state statutory, common, and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

4. Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1395(a), and 31 U.S.C. § 3732(a), because the claims arose in the Western District of Virginia, at least some of the false or fraudulent acts occurred in this District, and the Defendant transacts business in this District.

## II. PARTIES

5. The United States, acting through the Department of Health and Human Services ("HHS"), administers grants to states for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* (2018) ("Medicaid"). The United States brings this civil action on behalf of itself and HHS, an agency of the United States, pursuant to 31 U.S.C. § 3730(b)(4)(A) and (c).

6. The Virginia Attorney General brings this action in the name of the Commonwealth for damages resulting from false claims submitted or caused to be submitted to DMAS, the agency that administers the Virginia Medicaid Program, pursuant to VA. CODE ANN. §§ 8.01-216.4 and 8.01-216.6.[2]

7. Jessica Patterson, "Relator" and resident of Lynchburg, Virginia, within the Western District of Virginia, commenced an action in this Court on September 30, 2019, pursuant to 31 U.S.C. § 3730(b).

8. Autumn Williams, "Relator" and resident of Amherst County, Virginia, within the Western District of Virginia, joined the action in this Court on November 5, 2019, pursuant to 31 U.S.C. § 3730(b).

9. Defendant 1st Adult & Pediatrics Healthcare Services, Inc. (formerly known as 1st Adult N Pediatrics Healthcare Services, Inc.), is a Virginia corporation with its principal place of business at 11130 Fairfax Boulevard, Suite 202, Fairfax, Virginia. 1st Adult also operated an office at 584 Front Street in Lovingston, Virginia, within the Western District of Virginia, which

[2] DMAS is the agency that administers the Virginia Medicaid Program for the Commonwealth under Title XIX of the Social Security Act. For purposes of this Complaint, the term DMAS includes, and is interchangeable with, the Virginia Medicaid Program and any contractors or Managed Care Organizations ("MCO") engaged by, or working on behalf of, DMAS or the Virginia Medicaid Program. The Virginia Office of the Attorney General brings this action in the name of the Commonwealth of Virginia exclusively on behalf of and for damages incurred by the Commonwealth through DMAS.

opened in or about June of 2019. 1st Adult was a registered Virginia Medicaid provider during the relevant time period of the conduct alleged herein and provided in-home health, personal care, and related services to Virginia Medicaid beneficiaries, including recipients living within the Western District of Virginia. 1st Adult billed DMAS for Medicaid reimbursement for various in-home health care services under National Provider Identification Number 1912356098.

**III. APPLICABLE LAW AND THE VIRGINIA MEDICAID PROGRAM**

10. The Medicaid program is a jointly funded federal and state program that provides health care coverage to eligible individuals. 42 U.S.C. § 1396 *et seq.*

11. Before receiving any federal Medicaid funds, participating states must submit a "state plan for medical assistance" to the Secretary of HHS, as required by Section 1902 of Title XIX of the Social Security Act. 42 U.S.C. § 1396a. This plan describes how a state will administer its Medicaid program and guarantees that the state will meet the applicable federal rules and regulations related to Medicaid, a requirement for federal funding.

12. The Commonwealth is a Medicaid participating state and Virginia law authorizes DMAS to administer the Virginia Medicaid program. VA. CODE ANN. § 32.1-325. DMAS is the single state agency designated by the General Assembly of Virginia, under the provision of Title XIX of the Social Security Act, to administer the Medicaid Program on a statewide basis in accordance with the requirements of 42 C.F.R. § 431.50. *See* 12 VA. ADMIN. CODE §§ 30-10-10 *et seq*.; *id.* at 30-10-30.

13. DMAS provides Medicaid services that are billed and reimbursed on a fee-for-service ("FFS") basis and through so-called managed care organizations ("MCOs").

14. Federal and state regulations describe in detail the requirements of MCOs and providers participating in managed care plans that serve Medicaid beneficiaries. *See, e.g.*, 42 C.F.R. §§

438.1 *et seq*.; 12 VA. ADMIN. CODE §§ 30-120-360 *et seq*. In very general terms, MCOs contract with DMAS to offer Medicaid-covered services to their beneficiaries (in accordance with applicable regulations and the terms of the state contract), and providers in turn contract with the MCOs to deliver the actual services to the beneficiaries. Both FFS and managed care recipients, however, are Virginia Medicaid Program beneficiaries and their services are paid through funds provided by the United States and the Commonwealth through the Virginia Medicaid Program. Consequently, payment for services ultimately comes from the Virginia Medicaid Program regardless of whether a provider bills DMAS directly or submits claims through a contracted MCO. In fact, under both the FCA and the VFATA, a "claim" includes any request for money or payment when the United States or the Commonwealth provides any portion of the funds or reimburses a contractor, grantee, or recipient for any portion of the money that is requested. *See* 31 U.S.C. § 3729(b)(2)(A) and VA CODE ANN. § 8.01-216.2.

15. State plans for medical assistance are required to provide certain home health services to qualifying individuals under the terms of the state plan. *See* 42 U.S.C. § 1396a(a)(10)(D); 42 C.F.R. §§ 440.70 and 441.15; 12 VA. ADMIN. CODE § 30-10-220. *See also, e.g.,* Home Health Manual, Ch. IV (July 27, 2021).

16. During the relevant time period of the conduct alleged herein, DMAS administered a number of other benefits or programs under the Virginia Medicaid Program that included coverage for various in-home health care and related services. For example, one relevant Medicaid benefit for eligible beneficiaries under age 21 is known as Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT"). EPSDT is a benefit pursuant to Sections 1902(a)(43) and 1905(a)(4)(B) and (r) of the Social Security Act, 42 U.S.C. §§ 1396a(a)(43) and 1396d(a)(4)(B) and (r), and is geared toward the assessment of children's health care issues to allow for the diagnosis and

treatment of health problems as early as possible. Per section 1905(r)(5) of the Social Security Act, the EPSDT benefit includes all necessary health care, diagnostic services, treatment, and other measures described in section 1905(a) of the Social Security Act to correct or ameliorate defects and physical and mental illnesses and conditions discovered by screening services, whether or not such services are covered under the Medicaid state plan. This would include Medicaid coverage for at-home nursing and personal care services that could be covered under benefits listed in section 1905(a) of the Social Security Act, whether or not the state plan already includes those benefits. *See* 42 U.S.C. § 1396d(r)(5); *see also* 12 VA. ADMIN. CODE § 30-50-130.

17. In addition, DMAS administers services under a variety of so-called waiver programs under the Virginia Medicaid Program. For example, under Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c), states can seek approval from HHS, acting through the Centers for Medicare & Medicaid Services ("CMS"), to provide certain home and community-based services that would not otherwise be covered under the state Medicaid plan. The goal of such waiver programs is to allow the provision of Medicaid-covered services to recipients at home or in community settings, as opposed to institutional settings such as hospitals or nursing facilities.

18. During the relevant time period of the conduct alleged herein, DMAS administered a number of waiver programs that included Medicaid coverage for, among many other things, various in-home health and personal care services. Those programs included, but were not necessarily limited to, the Individual and Family Developmental Disabilities Support Waiver (12 VA. ADMIN. CODE § 30-120-700 *et seq*.), the Elderly or Disabled with Consumer Direction Waiver (12 VA. ADMIN. CODE § 30-120-900 *et seq*.), the Intellectual Disability Waiver (12 VA. ADMIN.

CODE § 30-120-1000 *et seq*.), and the Home and Community-Based Services for Technology Assisted Individuals Waiver (12 VA. ADMIN. CODE § 30-120-1700 *et seq*.).[3]

19. During the relevant time period of the conduct alleged herein, 1st Adult operated as an enrolled provider with the Virginia Medicaid Program, as further described below, and submitted claims for reimbursement to DMAS for various services, including but not limited to in-home health and personal care services covered under the Medicaid benefits and programs described herein.

A. Virginia Medicaid Provider Enrollment Requirements

20. A provider must execute a participation agreement with DMAS in order to enroll in the Virginia Medicaid program. By executing a participation agreement, a provider agrees to adhere to the policies and regulations contained in the DMAS Provider Manual(s)[4] pertaining to the specific service(s) it will provide, including documentation requirements and rules for billing DMAS. Moreover, a provider agrees to comply with all applicable state and federal laws, including state and federal repayment statutes.

---

[3] The various waiver programs have changed over time and several have been renamed. For example, as described in the Virginia Register of Regulations:

> This regulatory action redesigns three of the existing home and community-based waivers as follows: Individual and Family Developmental Disabilities Support Waiver (12VAC30-120-700 et seq.) is changing to the Family and Individual Supports (FIS) Waiver, Intellectual Disability Waiver (12VAC30-120-1000 et seq.) is changing to the Community Living (CL) Waiver, and the Day Support Waiver for Individuals with Mental Retardation (12VAC30-120-1500 et seq.) is changing to the Building Independence (BI) Waiver. The action repeals the existing regulations found in 12VAC30-120-700 et seq., 12VAC30-120-1000 et seq., and 12VAC30-120-1500 et seq. and promulgates a new chapter for the proposed FIS, CL, and BI Waivers in 12VAC30-122.

37:14 VA.R. 1577 March 1, 2021. Also included in the same issue of the Virginia Register is a description of and regulations related to "Commonwealth Coordinated Care Plus, the new statewide Medicaid managed long-term services and supports program…" which is described in additional detail herein. 37:14 VA.R. 1564 March 1, 2021.

[4] Provider Manuals are official publications of DMAS and their contents are incorporated by reference into participation agreements signed by providers enrolled in the Medicaid Program. DMAS periodically revises and updates Provider Manuals.

21. 1st Adult has been a Virginia Medicaid provider since approximately December 2016. 1st Adult entered into participation agreements with DMAS on or about December 16, 2016 (for Personal Care, Private Duty Nursing, and Respite Care services) and on or about January 4, 2017 (for Home Health services).

B. Virginia Medicaid Documentation Requirements

22. The Virginia Administrative Code and the various DMAS Provider Manuals, some of which are described in further detail herein, set out detailed service and documentation requirements for Medicaid providers, including but not limited to providers such as 1st Adult that provide in-home health, personal care, and related services available under applicable Medicaid benefits and waiver programs.

23. Regardless of the applicable benefit or waiver program under which home health and other related services are provided, Medicaid providers must, among other things, appropriately document the services they provide (for example, through daily or weekly progress notes). Furthermore, for in-home nursing, personal care, and related services, Virginia Medicaid Program providers must appropriately document progress notes for each service unit they bill to DMAS. Because Medicaid reimbursement is based on the actual services provided and the time spent with each recipient, the content of each progress note must corroborate the time spent and specifically document the services the provider rendered to support each of the units billed.[5]

[5] As mentioned previously, some of the various Medicaid benefits and waiver programs have changed over time and several have been renamed. The paragraphs in this section highlight some of the requirements for the various benefits and programs as detailed in the Virginia Administrative Code and relevant DMAS Provider Manuals. The sections quoted or highlighted here are relevant examples but do not necessarily represent every regulation or rule that applies to the Defendant's provision of services or billing practices. Furthermore, although the benefits and waiver programs are detailed herein as background information, 1st Adult's fraudulent billing discussed in detail below is problematic regardless of which specific benefit or program is applicable in any particular instance.

24. Under the EPSDT benefit, as previously mentioned, Virginia covers a wide variety of services for Medicaid beneficiaries under age 21, pursuant to 42 U.S.C. § 1396d(r), including services "to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services and that are medically necessary…." 12 VA. ADMIN. CODE § 30-50-130.B.4. (2015); *see also* 42 U.S.C. § 1396d(r)(5). The DMAS Provider Manuals for EPSDT services provide, for example, that reimbursement is available only for allowable activities provided by a qualified provider in accordance with an approved Plan of Care; that documentation must reflect start and end times for the delivery of services; and that the notes must reflect a comprehensive assessment (for nursing services) or the specific services provided to the recipient (for personal care services). *See* EPSDT Supplement, Private Duty Nursing Services, pp. 10-11, 17 (June 30, 2017); EPSDT Supplement, Personal Care Services, pp. 16, 21 (June 30, 2017).

25. Under the Individual and Family Developmental Disabilities Support ("IFDDS") Waiver, providers were required to "maintain and retain business and professional records sufficient to document fully and accurately…the care provided" including "an attendance log or similar document…that indicates the date services were rendered, type of services rendered, and number of hours/units provided (including specific time frame)." *See* 12 VA. ADMIN. CODE § 30-120-730.A. (2014). The DMAS Provider Manual for the IFDDS Waiver included similar provisions (for example, that reimbursement is available only when the recipient is present and when services are actually being provided by a qualified provider; that services must be provided in accordance with a recipient's Plan of Care; that documentation must reflect arrival and departure times and include the specific services provided; and that nursing hours cannot be reimbursed while the recipient is an inpatient in an acute care hospital). *See* IFDDS Manual, Ch. IV, pp. 1, 43-45, 47, 53 (November 21, 2013).

26. Under the Elderly or Disabled with Consumer Direction ("EDCD") Waiver, providers were required to "maintain and retain business and professional records sufficient to document fully and accurately…the care provided" including "the specific services delivered" and the aide's "actual daily arrival and departure times." *See* 12 VA. ADMIN. CODE §§ 30-120-930.A. and 30-120-935.F. (2015). The DMAS Provider Manual for the EDCD Waiver included similar provisions (for example, that reimbursement is available only when the recipient is present and when services are being provided by a qualified provider; that payment is only available for care that is authorized and provided in accordance with an approved Plan of Care; and that documentation must reflect actual arrival and departure times and specific services provided). *See* EDCD Manual, Ch. IV, pp. 8, 17, 38 (January 6, 2016).

27. Under the Intellectual Disability ("ID") Waiver (previously known as the Mental Retardation/Intellectual Disability ("MR/ID") Waiver), providers were required to "maintain and retain business and professional records sufficient to document fully and accurately…the care provided" including, for example, "the specific services delivered" and "the assistant's arrival and departure times." *See* 12 VA. ADMIN. CODE § 30-120-1040.C.; *Id*. § 30-120-1060.I. (2013). The DMAS Provider Manual for the ID Waiver included similar provisions (for example, that reimbursement is available only for allowable activities when the recipient is present and when services are being provided by a qualified provider in accordance with an approved Plan for Supports; and that documentation must reflect actual arrival and departure times and the amount and type of services provided). *See* MR/ID Manual, Ch. IV, pp. 54-55, 59, 75 (July 14, 2010).

28. Under the Home and Community-Based Services for Technology Assisted Individuals ("Tech") Waiver, providers were required to "maintain and retain business and professional records sufficient to document fully and accurately…the services provided" including, for

example, records that are "completed, signed, and dated" and include "arrival and departure times for each shift that is worked." *See* 12 VA. ADMIN. CODE §§ 30-120-1730.A. (2014). The DMAS Provider Manual for the Tech Waiver included similar provisions (for example, that reimbursement is available only when the recipient is present and when services are being provided by a qualified provider in accordance with an approved Plan of Care; and that documentation must reflect the attendant's arrival and departure times as well as the recipient's "emotional condition, daily activities, and…response to services rendered."). *See* Tech Waiver Manual, Ch. IV, pp. 26, 35, 39, 49-50 (August 8, 2016).

29. Similar requirements were included in the rules and regulations covering the newer, redesigned waiver programs (the FIS, CL, and BI Waivers) mentioned above. For example, the new regulations require that providers "maintain and retain business records…and professional records" that "document fully and accurately the nature, scope, and details of the services provided to support claims for reimbursement." *See* 12 VA. ADMIN. CODE § 30-122-120.A. (2021). The DMAS Provider Manual covering the redesigned waiver programs includes similar requirements (for example, that services are only appropriate if they are consistent with a recipient's needs as documented in the individual's Plan for Supports; and that documentation for private duty or skilled nursing services "must clearly reflect the [specific nursing or care] service authorized and provided and support all claims submitted for DMAS reimbursement."). *See* Developmental Disabilities Waivers (BI, FIS, CL) Services Manual, Ch. IV, pp. 20-22, 142, 146 (February 24, 2022).

30. The Commonwealth Coordinated Care Plus ("CCC Plus") Waiver, mentioned above, was implemented via emergency regulation. *See* 34:24 VA.R. 2377 *et seq*. July 23, 2018. The CCC Plus Waiver essentially combined the EDCD and the Tech Waivers and incorporated the service

requirements of those waiver programs. *See* 12 VA. ADMIN. CODE § 30-120-630 (2021). The DMAS Provider Manual for the CCC Plus Waiver Program includes familiar language regarding provider and payment requirements, such as allowing payment "only for allowable activities that are authorized and provided by a qualified provider…" and that provider aide records must include the "specific services" provided and the "personal care/respite aide's actual daily arrival and departure times." *See* CCC Plus Waiver Services Manual, Ch. IV, pp. 17, 39 (May 1, 2019).

## IV. THE FALSE CLAIMS ACT, THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT, AND THE VIRGINIA MEDICAID FRAUD STATUTE

31. The FCA, 31 U.S.C. §§ 3729 *et seq*., imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).[6] The FCA also prohibits any person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. at (a)(1)(B). The FCA further imposes liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id*. at (a)(1)(G).

32. Under the FCA, the terms "knowing" and "knowingly" are defined to include actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of information and requires no specific intent to defraud. *Id*. § 3729(b)(1). The term "obligation," under the statute, includes the "retention of any overpayment." *Id*. § 3729(b)(3).

[6] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009.

33. As amended by Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), an overpayment is defined as "any funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." 42 U.S.C. § 1320a-7k(d)(4)(B). The "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." *Id*. § 1320a-7k(d)(2).

34. Failure to return any overpayment constitutes a reverse false claim actionable under section 3729(a)(1)(G) of the FCA.

35. The VFATA, VA. CODE ANN. §§ 8.01-216.1 *et seq.*, became effective on January 1, 2003, and is modeled after and closely mirrors the language of the FCA. Similar to the FCA, the VFATA broadly covers all types of fraud occurring on the Commonwealth, including fraud on the Virginia Medicaid Program. Like the FCA, the VFATA imposes civil liability on any person who knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval, VA. CODE ANN. § 8.01-216.3(A)(1), or for knowingly making, using, or causing to be made or used, a false record or material statement, for payment or approval. *Id*. at (A)(2). The VFATA also prohibits a person from knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Commonwealth. *Id*. at (A)(8).

36. Under the VFATA, the terms "knowing" and "knowingly" are defined to include actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of information and requires no specific intent to defraud. *Id*. § 8.01-216.3(C). And like the FCA, the VFATA also provides that the term "obligation" includes the "retention of any overpayment." *Id*. § 8.01-216.2.

37. Under both the FCA and the VFATA, a claim includes any request for money or payment when the United States or the Commonwealth provides any portion of the funds or reimburses a contractor, grantee, or recipient for any portion of the money that is requested. 31 U.S.C. § 3729(b)(2)(A); VA CODE ANN. § 8.01-216.2.

38. For FCA violations, the statute provides for treble damages and civil penalties. 31 U.S.C. § 3729(a)(1). Similarly, the VFATA provides for treble damages in addition to civil penalties. VA. CODE ANN. § 8.01-216.3(A).

39. The Virginia Medicaid Fraud Statute prohibits any person, agency, or institution from using willful false statements, willful misrepresentations, willful concealment of material facts, or any other fraudulent scheme or device to obtain or attempt to obtain any medical assistance benefits or payments in a greater amount than that to which the person is entitled when the Commonwealth directly or indirectly provides any medical assistance benefits or payments. VA. CODE ANN. § 32.1-312.

40. Any person, agency, or institution that violates this statute is liable to the Commonwealth for the amount of any excess benefits or payments, plus interest and civil penalties, not to exceed three times the amount of the excess benefits or payments. VA. CODE ANN. § 32.1-312(B).

## V. FRAUDULENT SCHEME

41. From at least January 1, 2017 through May 1, 2021, 1st Adult engaged in a scheme to obtain payments from the Virginia Medicaid Program for in-home health and personal care services to which they were not entitled, by submitting or causing to be submitted false and/or fraudulent claims to DMAS and by failing to take steps to repay overpayments after 1st Adult identified these claims.

42. As described above, the various Medicaid benefit and waiver programs all require, in substance, that providers of in-home health, personal care, and related services accurately document the services that are being provided and that reimbursement is available only when services are being actually provided by a qualified provider.

43. On thousands of occasions, however, 1st Adult submitted claims to, and received reimbursement from, the Virginia Medicaid Program for in-home nursing, personal care, and related services that did not occur and/or were not properly documented in the nursing or care notes maintained by 1st Adult ("overbilling").

44. In addition, 1st Adult improperly submitted claims to, and received reimbursement from, the Virginia Medicaid Program for in-home health, personal care, and related services that would have been impossible because they overlapped with times when recipients were hospitalized ("overlapping billing").[7]

45. 1st Adult also improperly created numerous false records (including forging signatures of nurses and personal care aides), created nursing and care notes that were entirely false, and retained payments for which 1st Adult maintained no records of the billed services at all ("false records") in violation of the law.

46. Finally, 1st Adult failed to maintain adequate staffing to provide the care for which 1st Adult billed the Virginia Medicaid Program and therefore knew, or should have known, that 1st

[7] The Government's review of "overlapping" claims as described herein only included certain inpatient hospital stays and did not involve any other hospital visits or other possible provider types (skilled nursing, hospice, adult day programs, etc.). In addition, most of the "overlapping" claims also fall into the "overbilling" category, so although these problematic billing issues are described separately herein, the claims and overpayment amounts have not been duplicated or double counted. In other words, the total amount referenced for a recipient includes all improper reimbursement received by 1st Adult for that recipient.

Adult was incapable of providing the level of services for which it billed the Virginia Medicaid Program.

A. The Virginia Medicaid Recipients

47. 1st Adult submitted or caused to be submitted false claims to DMAS for at least eighteen Virginia Medicaid recipients, resulting in the Virginia Medicaid program paying 1st Adult no less than $3,655,233.88 for in-home health, personal care, and related services that were never provided or not properly documented by 1st Adult, as described in further detail below.[8]

***Patient 1***[9]

48. Patient 1 was a Virginia Medicaid recipient born in 2016 who required multivisceral transplantation due to multiple organ failures. Patient 1 also suffered from acute colitis and acute graft-versus-host disease, arising from an auto-immune response rejecting the multivisceral transplantation.

49. Between approximately April 1, 2018 and December 1, 2018, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 1 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for three claims totaling 456 hours of nursing care services for Patient 1 during this period, but only documented performing 71 hours of care.

50. Furthermore, 1st Adult received payment for approximately 144 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 1 was hospitalized

[8] For purposes of the discussion herein of recipient-specific claims, the Government has only included claims submitted by 1st Adult that were actually reimbursed by the Virginia Medicaid Program. There were many additional claims submitted by 1st Adult for these recipients that were denied or otherwise not paid, and the Government notes that such claims may also be appropriately categorized as "false" and subject to per-claim penalties under the FCA and VFATA to the extent that they sought payment for services that were impossible, not provided, or not properly documented.

[9] The Government will file under seal a corresponding chart identifying each of the 18 patients by name, Medicaid ID number, social security number, or any other manner as prescribed by the Court.

from April 11, 2018 to May 17, 2018, as well as from July 3, 2018 to November 8, 2018. Specifically, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for the time periods of April 1, 2018 to April 15, 2018, as well as June 27, 2018 to July 15, 2018, which included times that would not have been possible due to Patient 1's hospitalizations.

51. For example, 1st Adult was reimbursed for 228 hours of care for Patient 1 for the period of June 27, 2018 to July 15, 2018. Patient 1, however, was hospitalized from July 3, 2018 to November 8, 2018 as mentioned above. Even if the hours provided had been properly documented (they were not – only 36 hours were documented from June 27 through July 2, and nothing thereafter), it would not have been possible for 1st Adult to provide 228 hours of service because there are not 228 hours in seven days (June 27 through July 3). Furthermore, it appears as though Patient 1 was only authorized to receive 12 hours of care per day from 1st Adult during this period.

52. In total, 1st Adult received no less than $12,308.45 from Virginia Medicaid for services for Patient 1 that it did not provide or failed to properly document between approximately April 2018 and Patient 1's death in November 2018 at just over two years of age.

***Patient 2***

53. Patient 2 is a Virginia Medicaid recipient born in 2014 who suffered from acute flaccid myelitis, a rare polio-like condition that affects the body's nervous system, specifically the spinal cord. Patient 2 had a tracheostomy (breathing tube), gastronomy tube (feeding tube), and was on a ventilator.

54. Between approximately January 1, 2019 and April 30, 2019, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 2 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for eight

claims totaling 1,136 hours of nursing care services during this period for Patient 2, but only documented performing 186 hours of care.

55. Furthermore, 1st Adult received payment for 48 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 2 was hospitalized from March 24, 2019 to April 18, 2019. Specifically, 1st Adult billed for and was reimbursed by Virginia Medicaid for 48 hours of nursing care services that fell within the time period of April 15, 2019 to April 17, 2019, that would not have been possible due to Patient 2's hospitalization.

56. In total, 1st Adult received no less than $24,946.97 from Virginia Medicaid for services for Patient 2 that it did not provide or failed to properly document.

***Patient 3***

57. Patient 3 is a Virginia Medicaid recipient born in 2006 and diagnosed with spastic quadriplegia, epilepsy, and unspecific paralytic syndrome.

58. Between approximately February 1, 2017 and April 30, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 3 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 217 claims totaling 27,705 hours (or 110,820 units) of nursing care services during this period for Patient 3, but only documented performing 20,889 hours (or 83,556 units) of care.

59. In total, 1st Adult received no less than $216,821.13 from Virginia Medicaid for services for Patient 3 that it did not provide or failed to properly document.

***Patient 4***

60. Patient 4 is a Virginia Medicaid recipient diagnosed with numerous serious medical issues including GERD, gastritis, gastrostomy and respiratory distress. Patient 4 also had a tracheostomy.

61. Between approximately December 1, 2017 and April 30, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing, personal care, and respite care services for Patient 4 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 405 claims totaling 19,543 hours of care services during this period for Patient 4, but only documented performing 11,168 hours of care.

62. In total, 1st Adult received no less than $211,043.31 from Virginia Medicaid for services for Patient 4 that it did not provide or failed to properly document.

***Patient 5***

63. Patient 5 is a Virginia Medicaid recipient born in February 2001.

64. Between approximately February 1, 2017 and April 30, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing and personal care services for Patient 5 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 321 claims representing 27,473 hours of nursing and personal care services during this period for Patient 5, but only documented performing 2,689 hours of care.

65. In total, 1st Adult received no less than $675,552.44 from Virginia Medicaid for services for Patient 5 that it did not provide or failed to properly document.

***Patient 6***

66. Patient 6 was a Virginia Medicaid recipient born in 2018 who was diagnosed with Vici syndrome, a multisystem disorder involving abnormalities of the brain, immune system, heart, skin, and eyes. Due to this condition, Patient 6 had a gastronomy tube, developmental delays, and endured laparoscopic surgery.

67. Between approximately December 1, 2018 and March 31, 2019, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 6 that it failed to provide

or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 12 claims totaling 1,080 hours of nursing care services during this period for Patient 6, but only documented performing 227 hours of care.

68. Furthermore, 1st Adult received payment for approximately 257 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 6 was hospitalized on four separate occasions from December 2018 through March 2019. Specifically, Patient 6 was hospitalized from December 24, 2018 to December 26, 2018; from December 31, 2018 to January 8, 2019; from February 5, 2019 to February 21, 2019; and from March 1, 2019 to March 25, 2019. 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services that fell within those time periods that would not have been possible due to Patient 6's hospitalizations.

69. For example, 1st Adult was reimbursed for 84 hours of care for Patient 6 for the period of February 11, 2019 to February 17, 2019. Patient 6, however, was hospitalized from February 5, 2019 to February 21, 2019 as mentioned above, meaning that all 84 hours of these purported services by 1st Adult would have been impossible.

70. In total, 1st Adult received no less than $26,769.41 from Virginia Medicaid for services for Patient 6 that it did not provide or failed to properly document. Patient 6 died in August 2020 at just under three years of age.

***Patient 7***

71. Patient 7 is a Virginia Medicaid recipient born in May 2017.

72. Between approximately October 1, 2017 and May 1, 2021, 1st Adult received payment from Virginia Medicaid for 213 claims totaling 22,978 hours of nursing and respite care services. Based on its own records, however, 1st Adult failed to document a single hour of care for Patient 7.

73. In total, 1st Adult received no less than $628,201.86 from Virginia Medicaid for services for Patient 7 that it did not provide or failed to properly document.

***Patient 8***

74. Patient 8 is a Virginia Medicaid recipient born in 2016 with congenital polycystic kidney disease and fitted with a gastronomy tube. Patient 8 also suffered from developmental delays.

75. Between approximately January 1, 2018 and February 28, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing, personal care, and respite care services for Patient 8 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 468 claims totaling 20,688 hours of nursing, personal care, and respite care services during this period for Patient 8, but only documented performing 16,935 hours of care.

76. In total, 1st Adult received no less than $97,987.58 from Virginia Medicaid for services for Patient 8 that it did not provide or failed to properly document.

***Patient 9***

77. Patient 9 is a Virginia Medicaid recipient born in 2017 with numerous developmental symptoms, including dependence on a ventilator, as well as a tracheostomy and gastrostomy.

78. Between approximately April 1, 2018 and September 30, 2019, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 9 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 61 claims totaling 7,696 hours of nursing care services during this period for Patient 9, but only documented performing 2,345 hours of care.

79. Furthermore, 1st Adult received payment for approximately 544 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 9 was hospitalized

on five occasions between April 1, 2018 and September 30, 2019. 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 9 that fell within at least two of those hospitalization periods (April 14, 2018 to June 5, 2018; and June 8, 2018 to June 14, 2018) that would not have been possible.

80. For example, 1st Adult was reimbursed for 368 hours of care for Patient 9 for the period of April 16, 2018 to May 7, 2018. Patient 9, however, was hospitalized from April 14, 2018 to June 5, 2018 as mentioned above, meaning that all 368 hours of these purported services by 1st Adult would have been impossible.

81. In addition, 1st Adult also specifically documented care for Patient 9 at times when it appears as though it would not have been possible. For example, a nursing note dated September 4, 2018 states that the nurse was at Patient 9's home from 12:00 p.m. to 8:00 p.m., and even indicates that Patient 9 returned home from the hospital that day. Hospital records, however, indicate that Patient 9 was admitted on August 30, 2018 and discharged at 3:50 p.m. on September 4, 2018. This suggests that some of the time documented by 1st Adult as having been spent with Patient 9 on September 4, 2018 would have been impossible.

82. In total, 1st Adult received no less than $187,665.13 from Virginia Medicaid for services for Patient 9 that it did not provide or failed to properly document.

***Patient 10***

83. Patient 10 is a Virginia Medicaid recipient born in August 2017.

84. Between approximately July 1, 2018 and August 31, 2018, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 10 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for six

claims totaling 856 hours of nursing care services during this period for Patient 10 but failed to document a single hour of care.

85. Furthermore, 1st Adult received payment for approximately 156 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 10 was hospitalized on three separate occasions between July 1, 2018 and August 31, 2018. 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 10 that fell within at least the first of those hospitalizations (July 24, 2018 to August 7, 2018) that would not have been possible.

86. Specifically, 1st Adult was reimbursed for 168 hours of care for Patient 10 for the period of July 23, 2018 to August 5, 2018. Patient 10, however, was hospitalized from July 24, 2018 to August 7, 2018 as mentioned above, meaning that nearly all hours of purported services by 1st Adult during that period would have been impossible.

87. In total, 1st Adult received no less than $23,513.52 from Virginia Medicaid for services for Patient 10 that it did not provide or failed to properly document.

***Patient 11***

88. Patient 11 is a Virginia Medicaid recipient born in September 2017 who suffers from bronchopulmonary dysplasia, a form of chronic lung disease. As a result, Patient 11 is dependent on a ventilator with a gastrostomy tube.

89. Between approximately September 1, 2017 and April 30, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing, personal care, and respite care services for Patient 11 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 310 claims totaling 24,293 hours of nursing, personal care,

and respite care services during this period for Patient 11, but only documented performing 1,760 hours of care.

90. In total, 1st Adult received no less than $652,935.39 from Virginia Medicaid for services for Patient 11 that it did not provide or failed to properly document.

***Patient 12***

91. Patient 12 is a Virginia Medicaid recipient born in September 1999 who suffers from cerebral palsy, which requires wheelchair usage and oxygen. Patient 12 also suffers from epilepsy and gastronomy.

92. Between approximately February 1, 2017 and April 30, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 12 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 201 claims totaling 29,948 hours (or 119,792 units) of nursing care services during this period for Patient 12, but only documented performing 24,521 hours (or 98,084 units) of care.

93. Furthermore, 1st Adult received payment for at least 408 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 12 was hospitalized on five separate occasions between March 1, 2017 and June 1, 2018. 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 12 that fell within all five of those hospitalization periods, at least some of which would not have been possible.

94. For example, 1st Adult was reimbursed for 384 units (or 96 hours) of care for Patient 12 for the period of March 13, 2017 to March 16, 2017, which represents purported services for 24 hours per day each day. Patient 12, however, was hospitalized from March 13, 2017 to March 23, 2017, meaning that three-plus 24-hour periods of purported services by 1st Adult would have been impossible.

95. Furthermore, for each of the seven-day periods of March 20, 2017 to March 26, 2017 and July 17, 2017 to July 23, 2017, 1st Adult was reimbursed for 672 units (or 168 hours) for Patient 12, which represents purported services for 24 hours per day each day. Patient 12, however, was hospitalized from March 13, 2017 to March 23, 2017 as mentioned above, and again from July 11, 2017 to July 20, 2017, meaning that multiple hours and days of purported services by 1st Adult would have been impossible.

96. Similarly, 1st Adult was reimbursed for 576 units (or 144 hours) of care for Patient 12 for the period of May 21, 2018 to May 27, 2018. Patient 12, however, was hospitalized from May 22, 2018 to June 1, 2018, again meaning that multiple hours and days of purported services by 1st Adult would have been impossible.

97. In some instances, 1st Adult also specifically documented care for Patient 12 at times when it would not have been possible to provide care. As mentioned above, Patient 12 was hospitalized from March 13, 2017 to March 23, 2017. 1st Adult, however, had numerous (at least 16) completed nursing records during that time period for Patient 12, each covering 12 hours of purported care at a time, for care that would have been impossible.

98. For example, a nursing note dated March 14, 2017 states that Patient 12 was "in bed asleep peacefully," along with a variety of purported care activities being performed with Patient 12, such as cleaning Patient 12's g-tube site and administering medication. Similarly, a nursing note dated March 16, 2017 states that Patient 12 was "in bed awake [and] very comfortable," also listing variety of purported care activities being performed with Patient 12. And a nursing note dated March 20, 2017 states that Patient 12 was "in bed awake," a "complete body assessment [was] done," and a variety of other purported care activities were performed with Patient 12.

99. For another period of hospitalization, Patient 12 arrived at the hospital on July 11, 2017 at 12:13 a.m. and was admitted at 4:01 a.m. according to hospital records (Patient 12 remained in the hospital until July 20, 2017). A nursing note dated and signed July 11, 2017, however, states that the nurse was at Patient 12's home from 6:30 p.m. to 6:30 a.m. and lists a variety of care activities done with Patient 12. Regardless of which overnight that record was meant to cover (July 10 to July 11, or July 11 to July 12), at least a portion of that time documented by 1st Adult as having been spent with Patient 12 would have been impossible.

100. In yet another example, Patient 12 was admitted to the hospital on September 7, 2017 at 11:05 a.m. and remained hospitalized until September 14, 2017. A 1st Adult nursing note dated September 8, 2017, however, states that Patient 12 was "awake and in bed" and listed a number of purported care activities being performed with Patient 12. The care activities purportedly provided on September 8, 2017 would have been impossible due to Patient 12's hospitalization.

101. In total, 1st Adult received no less than $173,250.01 from Virginia Medicaid for services for Patient 12 that it did not provide or failed to properly document.

***Patient 13***

102. Patient 13 is a Virginia Medicaid recipient born in February 2017 who suffers from bronchopulmonary dysplasia, a form of chronic lung disease. This requires Patient 13 to be dependent on a ventilator with a gastronomy tube.

103. Between approximately November 1, 2017 and April 30, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing, personal care, and respite care services for Patient 13 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 270 claims totaling 23,420 hours of nursing, personal care,

and respite care services during this period for Patient 13, but only documented performing 17,127 hours of care.

104. In total, 1st Adult received no less than $175,141.50 from Virginia Medicaid for services for Patient 13 that it did not provide or failed to properly document.

***Patient 14***

105. Patient 14 is a Virginia Medicaid recipient born in October 2013 who suffers from a single ventricle defect which causes only one ventricle in the heart to pump effectively. Patient 14 also suffers from developmental delays and gastrostomy, which surgically allows for the introduction of food from the abdominal wall into the stomach.

106. Between approximately January 1, 2017 and January 31, 2021, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing, personal care, and respite care services for Patient 14 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 512 claims totaling 22,083 hours of nursing, personal care, and respite care services during this period for Patient 14, but only documented performing 16,781 hours of care.

107. In total, 1st Adult received no less than $127,457.12 from Virginia Medicaid for services for Patient 14 that it did not provide or failed to properly document.

***Patient 15***

108. Patient 15 is a Virginia Medicaid recipient born in June 2016 who suffered from Trisomy 21, also known as Down Syndrome. Patient 15 also suffered from developmental delays and required a cardiac catheterization, tracheostomy, and gastrostomy tube.

109. Between approximately March 1, 2017 to April 30, 2017, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 15 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for

five claims totaling 440 hours of nursing care services during this period for Patient 15, but only documented performing 216 hours of care.[10]

110. In total, 1st Adult received no less than $6,802.88 from Virginia Medicaid for services it did not provide or failed to properly document. Patient 15 died in August 2017 at just over one year of age.

***Patient 16***

111. Patient 16 is a Virginia Medicaid recipient born in March 2016.

112. 1st Adult received payment from Virginia Medicaid for 239 claims totaling 12,098 hours of nursing, personal care, and respite care services for Patient 16. Based on its own records, however, 1st Adult failed to document a single hour of care for Patient 16.[11]

113. In total, 1st Adult received no less than $294,553.20 from Virginia Medicaid for services for Patient 16 that it did not provide or failed to properly document.

***Patient 17***

114. Patient 17 is a Virginia Medicaid recipient born in 2016 who suffers from gastroenterology dysmotility, colon aganglionosis, mucocutaneous fistula, which all affect various parts of the colon, stomach, skin, and bowels. Patient 17 also required an ileostomy, a surgery to divert the small intestine through an opening in the abdomen.

---

[10] Patient 15 was also hospitalized from March 20, 2017 to March 23, 2017. It is unclear from the Medicaid claims data whether any of the reimbursed hours purportedly took place during that period because all of the 216 hours that were reimbursed for March 10, 2017 to March 31, 2017 were covered by one claim. 1st Adult does, however, have a Medication Administration Record in Patient 15's records indicating that medications were given to Patient 15 every day from March 10, 2017 to March 31, 2017. At least several entries on that record would have been impossible due to Patient 15's hospitalization.

[11] Patient 16 was also hospitalized from February 26, 2018 to March 15, 2018. It is unclear from the Medicaid claims data exactly how many reimbursed hours purportedly took place during that period, if any. 1st Adult was, however, reimbursed for purported services for Patient 16 for one claim for 24 hours with service "from" and "thru" dates of February 26, 2018; one claim for 24 hours with service "from" and "thru" dates of March 15, 2018; and one claim for 32 hours with service "from" and "thru" dates of March 15, 2018.

115. Between October 1, 2017 and July 31, 2019,[12] 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 17 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 13 claims totaling 954 hours of nursing care services during this period for Patient 17, but only documented performing 410 hours of care.[13]

116. Furthermore, 1st Adult received payment for approximately 93 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 17 was hospitalized on multiple (at least eight) occasions between October 1, 2017 and July 31, 2019. 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services that fell within several of those time periods that, assuming billing was consistent, would not have been possible due to Patient 17's hospitalizations.

117. In addition, 1st Adult also appears to have documented care for Patient 17 at times when it would not have been possible to provide care. For example, a nursing note dated April 26, 2018 states that the nurse arrived at Patient 17's home at 8:00 a.m., a call was placed to Patient 17's doctor and an order received to go to the hospital at 9:45 a.m., and Patient 17 was admitted to the hospital at 6:00 p.m. The hospital records, however, indicate that Patient 17 arrived at the hospital at 10:53 a.m. and was admitted at 11:02 a.m. on April 26, 2018, suggesting that at least some of the time documented by 1st Adult as having been spent with Patient 17 may have been impossible.

---

[12] For Patient 17, the Government requested and reviewed patient records and claims for several discrete time periods during this period: October 1, 2017 to November 30, 2017; March 1, 2018 to May 31, 2018; February 1, 2019 to February 28, 2019; and July 1, 2019 to July 31, 2019.

[13] One paid claim covered 168 purported hours of care for the time period of January 21, 2019 to February 17, 2019. It is unclear from the Medicaid claims data whether any of the reimbursed hours purportedly took place in January 2019. However, 1st Adult failed to provide documentation for a single hour of care for this time period (including February 2019, which was specifically requested), and the Government has accordingly included all of those 168 hours in the total as being overbilled.

118. In total, 1st Adult received no less than $18,312.11 from Virginia Medicaid for services for Patient 17 that it did not provide or failed to properly document.

***Patient 18***

119. Patient 18 is a Virginia Medicaid recipient born in 2017 who suffers from congenital diaphragmatic hernia, due to a hole in the diaphragm. This requires umbilical venous catheter placement and intubation procedures. Patient 18 also suffers from chronic lung disease, pulmonary hypertension, cardiac anomaly, and kidney anomaly.

120. Between approximately March 1, 2018 and April 30, 2019, 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 18 that it failed to provide or adequately document. Specifically, 1st Adult received payment from Virginia Medicaid for 34 claims totaling 3,812 hours of nursing care services during this period for Patient 18, but only documented performing 359 hours of care.

121. Furthermore, 1st Adult received payment for approximately 96 hours of nursing care services that it did not provide (and in fact could not provide) because Patient 18 was hospitalized on four occasions between March 1, 2018 and April 30, 2019. 1st Adult billed for and was reimbursed by Virginia Medicaid for nursing care services for Patient 18 that fell within at least two of those hospitalization periods (March 14, 2018 to March 20, 2018; and November 10, 2018 to November 13, 2018) that would not have been possible.

122. For example, 1st Adult was reimbursed for 84 hours of care for Patient 18 for the period of November 5, 2018 to November 11, 2018, and another 84 hours of care for the period of November 12, 2018 to November 18, 2018. Patient 18, however, was hospitalized from

November 10, 2018 to November 13, 2018, meaning that at least some of the hours during that period, assuming 1st Adult's billing was consistent, would have been impossible.[14]

123. In total, 1st Adult received no less than $101,971.87 from Virginia Medicaid for services for Patient 18 that it did not provide or failed to properly document beginning in June 2018.

B. 1st Adult's Improper Retention of Overpayments

124. As discussed above, both the FCA and the VFATA impose liability for a person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G); VA CODE ANN. § 8.01-216.3(A)(8).

125. Upon information and belief, 1st Adult identified overpayments received by 1st Adult from DMAS for undocumented and improperly reimbursed services but failed to return the improperly paid funds to the Government as required by law.

126. In or about May of 2021, 1st Adult provided to the Government documents for a number of the above-referenced 18 Medicaid recipients, including documents hereinafter referred to as "Audit Logs." One or more Audit Logs, described in further detail below, were provided for at least the following recipients: Patient 1, Patient 2, Patient 3, Patient 4, Patient 5, Patient 6, Patient 9, Patient 12, Patient 13, Patient 14, Patient 15, Patient 17, and Patient 18.

127. An Audit Log includes a brief introduction at the top that states something similar to: "1st Adult provided [nursing or other care services] to [Patient X]. We provided [X] hours per day / [X] hours per week." The Audit Log then generally includes the date that services began for the

---

[14] Assuming that 1st Adult's billing was consistent, the Government believes that 36 hours were improper for this period: 1) 12 hours each on November 11 and November 12, while Patient 18 was hospitalized; and 2) 12 hours on November 13 (even assuming Patient 18 could have been home in time for 1st Adult to provide 12 hours of service, there is no documentation of any care provided on November 13).

specific recipient, and in some instances also includes the date or dates associated with the recipient's authorization and certification periods for in-home health, personal care, and related services. This information is followed by a chart with columns for "Service Dates," "LPN/RN Weekly Hours," and "Missing Hours."

128. The following image is an example of the "Service Dates," "LPN/RN Weekly Hours," and "Missing Hours" chart from a portion of one of 1st Adult's Audit Logs:

| Service Dates | LPN/RN WEEKLY HOURS | MISSING HOURS |
|---|---|---|
| APRIL 2018 | | |
| | | |
| 04/01/2018-04/15/2018 | 0 | 180 |
| 04/16/2018-04/22/2018 | 0 | 84 |
| 04/23/2018-04/29/2018 | 0 | 84 |
| 04/30/2018 | 0 | 0 |
| Total: | 0 | 348 |
| | | |

129. Upon information and belief, the Audit Logs were created by 1st Adult during a review of its own records, and the hours identified in the "Missing Hours" columns of these Audit Logs are hours for which 1st Adult did not have proper corresponding service documentation.

130. In addition, in some instances the Audit Logs specifically identified periods of time when recipients were hospitalized, including periods of time during which 1st Adult's in-home health, personal care, and related services would have been impossible but for which 1st Adult nevertheless billed and was reimbursed by DMAS.

131. For example, the following image is a portion of an Audit Log for Patient 9 and specifically identifies "Missing Hours" associated with a period when Patient 9 was hospitalized, as described above:

| Service Dates | LPN/RN WEEKLY HOURS | MISSING HOURS | | |
|---|---|---|---|---|
| March 2018 | | | | |
| 03/14/2018-03/17/2018 | 36 | Not billed | | Hospitalized 03/17/2018-04/10/2018 |
| Total: | 36 | 0 | | |
| | | | | |
| APRIL 2018 | | | | |
| | | | | |
| 04/06/2018-05/07/2018 | 27 | 341 | | Hospitalized 04/14/2018-06/05/2018 |
| 05/08/2018-05/13/2018 | 0 | Not billed | | |
| 05/14/2018-05/20/2018 | 0 | 112 | | |
| 05/21/2018-05/27/2018 | 0 | 112 | | |
| 05/28/2018-06/03/2018 | 0 | 112 | | |

132. Accordingly, 1st Adult knowingly and improperly avoided an obligation to pay money to the Government, in violation of the FCA and the VFATA, when it identified overpayments made by DMAS for undocumented and improperly documented services and failed to return the improper payments for the associated claims.

## CLAIMS FOR RELIEF

**COUNT I**
False Claims Act, 31 U.S.C. §3729(a)(1)(A)
Making a False Claim

133. The Government re-alleges and incorporates herein by reference paragraphs 1 through 132 set out above.

134. The FCA, 31 U.S.C. § 3729 (a)(1)(A), provides, in relevant part, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval… is liable to the Unites States Government for a civil penalty . . . as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. §3729(a)(1)(A).[15]

135. 1st Adult presented or caused to be presented false or fraudulent claims for payment or approval to DMAS that were material to DMAS' decision to pay the claims. 1st Adult knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity presented, or caused to be presented, these materially false or fraudulent claims to the United States.

136. 1st Adult is, therefore, liable to the United States for civil penalties for each claim, plus three times the amount of damages the United States sustained because of 1st Adult's conduct.

[15] *See* 28 C.F.R. § 85.5, Table 1 for current inflation adjustments of civil penalties under the FCA.

**COUNT II**
False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
Knowingly Making or Using a False or Fraudulent Record Material to a False or Fraudulent Claim

137. The Government re-alleges and incorporates herein by reference paragraphs 1 through 136 set out above.

138. The FCA, 31 U.S.C. § 3729 *et seq*., provides in relevant part, that any person who "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim…is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461), plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(B).

139. 1st Adult knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid by DMAS.

140. 1st Adult's false and/or fraudulent representations to DMAS were material to DMAS' decision to pay the claims. 1st Adult knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity presented, or caused to be presented, false or fraudulent claims to the United States that were material for payment or approval.

141. 1st Adult is therefore liable to the United States for civil penalties for each claim, plus three times the amount of damages the United States sustained because of 1st Adult's conduct.

**COUNT III**
False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
Reverse False Claims

142. The Government re-alleges and incorporates herein by reference paragraphs 1 through 141 set out above.

143. 1st Adult knowingly and improperly avoided an obligation to pay money to the Government, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(G), when it learned of the overpayment made by DMAS for undocumented services and services documented for when a Medicaid recipient was actually hospitalized. 1st Adult failed to return the monies improperly paid for these false claims as required by 42 U.S.C. § 1320a-7k (d).

144. Because of 1st Adult's acts, the Government has suffered damages and is entitled to and requests treble damages under the FCA in an amount to be determined at trial, plus a civil statutory penalty for each violation.

**COUNT IV**
Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3(A)(1)
Making a False Claim

145. The Government re-alleges and incorporates herein by reference paragraphs 1 through 144 set out above.

146. The VFATA provides, in relevant part, that any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . shall be liable to the Commonwealth for a civil penalty . . . plus 3 times the amount of damages sustained by the Commonwealth." VA. CODE ANN. § 8.01-216.3(A)(1).[16]

---

[16] In order to effectuate compliance with the Deficit Reduction Act of 2005, Pub. L. 109-171, tit. VI, § 6031 (2006) (codified at 42 U.S.C. § 1396h), on or about March 30, 2018, the Virginia General Assembly amended the penalty language in Va. Code Ann. § 8.01-216.3 to mirror the FCA, which now provides that those who violate the VFATA:

> shall be liable to the Commonwealth for a civil penalty of not less than $10,957 and not more than $21,916, except that these lower and upper limits on liability shall automatically be adjusted to equal the amounts allowed under the Federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended, as such penalties in the Federal False Claims Act are adjusted for inflation by the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended (28 U.S.C. § 2461 Note, P.L. 101-410), plus three times the amount of damages sustained by the Commonwealth.

147. 1st Adult presented or caused to be presented false or fraudulent claims for payment or approval to DMAS that were material to DMAS' decision to pay the claims. 1st Adult knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity presented, or caused to be presented, these material false or fraudulent claims to the Commonwealth.

148. 1st Adult is, therefore, liable to the Commonwealth for civil penalties, plus three times the amount of damages the Commonwealth sustained because of 1st Adult's conduct.

**COUNT V**
Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(2)
Knowingly Making or Using a False or Fraudulent Record Material to a False or Fraudulent Claim

149. The Government re-alleges and incorporates herein by reference paragraphs 1 through 148 set out above.

150. The VFATA specifically provides, in relevant part, that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim shall be liable to the Commonwealth for a civil penalty as prescribed by law plus three times the amount of damages sustained by the Commonwealth. VA. CODE ANN. § 8.01-216.3(A)(2).

151. 1st Adult knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity submitted or caused to be submitted claims to the Commonwealth, through DMAS, which were false or fraudulent. As a result of the conduct alleged above, DMAS paid 1st Adult for the false claims it submitted or caused to be submitted for payment and suffered damages.

152. 1st Adult' false and/or fraudulent representations to DMAS related to patient eligibility criteria were material to DMAS' decision to pay the claims. Thus, 1st Adult

knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity presented, or caused to be presented, false or fraudulent claims to the Commonwealth that were material for payment or approval in violation of VA. CODE ANN. § 8.01-216.1, *et seq*.

153. 1st Adult is, therefore, liable to the Commonwealth for civil penalties plus three times the amount of actual damages the Commonwealth sustained because of 1st Adult's conduct.

**COUNT VI**
Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3(A)(9)[17]
Reverse False Claims

154. The Government re-alleges and incorporates herein by reference paragraphs 1 through 153 set out above.

155. 1st Adult made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the Commonwealth, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the Commonwealth.

156. 1st Adult knowingly and willfully retained overpayments it received from DMAS for claims after it had identified or should have identified those claims as false.

157. Such false records or statements or knowing concealment, avoidance or decrease of an obligation to pay or transmit money to the Commonwealth were made or done knowingly by 1st Adult, as defined in VA. CODE ANN. § 8.01-216.3(A)(9).

158. 1st Adult is therefore liable to the Commonwealth for civil penalties, plus three times the amount of damages the Commonwealth sustained because of 1st Adult's conduct.

[17] The VFATA's reverse false claims section was originally contained in VA. CODE ANN. § 8.01-216.3(A)(7), moved to VA. CODE ANN. § 8.01-216.3(A)(8) in 2020, and moved again to VA. CODE ANN. § 8.01-216.3(A)(9) in 2022 due to the adoption of additional subsections. The language of the reverse false claims section has remained unchanged since it was updated in 2011.

## COUNT VII

Virginia Medicaid Fraud Statute, VA. CODE ANN. § 32.1-312

159. The Government re-alleges and incorporates herein by reference paragraphs 1 through 158 set out above.

160. The Virginia Medicaid Fraud Statute, as amended, provides, in relevant part:

> A. No person, agency or institution, but not including an individual medical assistance recipient of health care, on behalf of himself or others, whether under a contract or otherwise, shall obtain or attempt to obtain benefits or payments where the Commonwealth directly or indirectly provides any portion of the benefits or payments pursuant to the Plan for Medical Assistance and any amendments thereto as provided for in § 32.1-325, hereafter referred to as "medical assistance" in a greater amount than that to which entitled by:
>
> > 1. Knowingly and willfully making or causing to be made any false statement or false representation of material fact;
> >
> > 2. Knowingly and willfully concealing or causing to be concealed any material facts; or . . .
>
> B. Any person, agency or institution knowingly and willfully violating any of the provisions of subsection A shall be (i) liable for repayment of any excess benefits or payments received, plus interest on the amount of the excess benefits or payments at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth and (ii) in addition to any other penalties provided by law, subject to civil penalties. The state Attorney General may petition the circuit court in the jurisdiction of the alleged offense, to seek an order assessing civil penalties in an amount not to exceed three times the amount of such excess benefits or payments. Such civil penalties shall not apply to any acts or omissions occurring prior to the effective date of this law.
>
> VA. CODE ANN. § 32.1-312.

161. 1st Adult made, caused to be made, or used claims which were false or fraudulent, in that these claims sought payment for undocumented services or for services billed when a Medicaid patient was actually hospitalized. The Commonwealth, through DMAS, paid these claims.

Accordingly, 1st Adult obtained, or attempted to obtain, excess payments from the Commonwealth by:

a) Knowingly and willfully making or causing to be made any false statement or false representation of material fact;

b) Knowingly and willfully concealing or causing to be concealed any material facts.

162. But for 1st Adult's actions as alleged above, DMAS would not have paid 1st Adult. Thus, the creation, use, and submission of the false claims were material to the Commonwealth's decision to pay 1st Adult.

163. Accordingly, 1st Adult is liable to the Commonwealth for repayment of any excess benefits or payments received, plus interest on the amount of the excess benefits or payments at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth and, in addition to any other penalties provided by law, civil penalties in an amount not to exceed three times the amount of such excess benefits or payments.

**COUNT VIII**
Unjust Enrichment

164. The Government re-alleges and incorporates herein by reference paragraphs 1 through 163 set out above.

165. 1st Adult submitted claims to DMAS for undocumented services and for services that could not have been rendered as billed because the Medicaid recipients were hospitalized at the time. DMAS thereafter paid 1st Adult based on 1st Adult's submission of those false or fraudulent claims.

166. 1st Adult knew that DMAS paid these claims.

167. 1st Adult accepted and retained payments for these false claims, rendering it inequitable for 1st Adult to retain those payments without returning the value. By receiving and retaining funds to which it was not entitled, 1st Adult was unjustly enriched and the Government deprived of its property.

168. The Commonwealth funds its Medicaid Program under a matching grant in which a portion of the money lost as a result of 1st Adult's fraudulent conduct alleged herein is federal funds, and a portion of the money lost as a result of 1st Adult's conduct alleged herein is the Commonwealth's funds.

169. 1st Adult was unjustly enriched, at the expense of the Government, in such amounts as determined at trial.

**COUNT IX**
Payment by Mistake

170. The Government re-alleges and incorporates herein by reference paragraphs 1 through 169 set out above.

171. DMAS made payments to 1st Adult based upon the belief that 1st Adult was properly entitled to receive those payments. DMAS based this belief upon representations made by 1st Adult that it was entitled to receive those payments. 1st Adult received and retained the benefit of those payments and it was not entitled to receive those payments.

172. DMAS's belief that 1st Adult was entitled to these payments was mistaken and erroneous because 1st Adult did not comply with the applicable statutes and regulations.

173. Due to these payments by mistake, 1st Adult has received monies to which it was not entitled.

174. The Commonwealth funds its Medicaid Program under a matching grant in which a portion of the money lost as a result of 1st Adult's fraudulent conduct alleged herein is federal funds, and

a portion of the money lost as a result of 1st Adult's conduct alleged herein is the Commonwealth's funds.

175. The Government is entitled to recover those funds wrongfully, erroneously, or illegally paid to 1st Adult.

176. 1st Adult's actions caused the Government to be damaged in a substantial amount to be determined at trial.

**COUNT X**
Common Law Fraud

177. The Government re-alleges and incorporates herein by reference paragraphs 1 through 176 set out above.

178. 1st Adult submitted or caused to be submitted claims for payment for undocumented services and for documented services that could not have been provided because the Medicaid recipient was hospitalized. DMAS thereafter paid 1st Adult based on 1st Adult's submission of such claims for payment.

179. 1st Adult knowingly, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity submitted or caused to be submitted claims to the Commonwealth that were false and/or fraudulent, in that these claims were based on falsified records or lack of documentation.

180. 1st Adult made or caused to be made false representations of material facts intentionally and knowingly with the intent to mislead the Commonwealth regarding 1st Adult's submission of such claims for payment.

181. 1st Adult intended that the Commonwealth rely upon these material representations.

182. The Commonwealth reasonably relied upon 1st Adult's fraudulent misrepresentations. As a result, the Commonwealth paid for claims that it otherwise would not have paid but for 1st Adult's fraudulent statements.

183. The Commonwealth funds its Medicaid Program under a matching grant in which a portion of the money lost as a result of 1st Adult's fraudulent conduct alleged herein is federal funds, and a portion of the money lost as a result of 1st Adult's fraudulent conduct alleged herein is the Commonwealth's funds.

184. Due to 1st Adult's fraudulent conduct alleged above, 1st Adult is liable to the United States and the Commonwealth for compensatory and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, the United States and the Commonwealth respectfully pray:

185. That the acts alleged herein be adjudged and decreed to be unlawful in violation of the False Claims Act, the Virginia Fraud Against Taxpayers Act, and the Virginia Medicaid Fraud Statute;

186. That the Government recover three-fold the damages determined to have been sustained by them pursuant to 31 U.S.C. § 3729(a) and VA. CODE ANN. § 8.01-216.3, and that judgment be entered against 1st Adult in favor of the Government;

187. That the Government recover costs pursuant to 31 U.S.C. § 3729(a)(3) and VA. CODE ANN. § 8.01-216.3(A);

188. That 1st Adult be ordered to pay civil penalties pursuant to 31 U.S.C. § 3729(a) and VA. CODE ANN. § 8.01-216.3(A) for each false claim filed;

189. That 1st Adult be ordered to pay the amount of excess payments made by the Commonwealth as a result of 1st Adult's violation of the Virginia Medicaid Fraud Statute plus

interest at the rate of 1.5 percent each month for the period from the date upon which payment was made to the date upon which repayment is made to the Commonwealth pursuant to VA. CODE ANN. § 32.1-312(B).

190. That 1st Adult be ordered, in addition to any other penalties provided by law, to pay civil penalties pursuant to VA. CODE ANN. § 32.1-312(B), for up to three times the amount of excess payments made by the Commonwealth as a result of 1st Adult's violations of the Virginia Fraud Statute;

191. That the 1st Adult be ordered to pay compensatory damages equal to the amount of excess payments made by the Commonwealth as a result of 1st Adult's actions plus punitive damages as deemed appropriate by the Court;

192. That 1st Adult be ordered to return, on equitable grounds, the amount of the fraudulently obtained payments to the Commonwealth and the United States.

193. That the Government be granted such other and further relief as the Court deems just, equitable, and proper.

DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, the United States and the Commonwealth hereby demand a trial by jury in this action of all issues so triable.

DATED: August 18, 2022

Respectfully submitted,

ANTHONY P. GIORNO
FIRST ASSISTANT UNITED STATES
ATTORNEY

By:

__/s/ *Justin M. Lugar*_____________
JUSTIN M. LUGAR (VSB #77007)
Assistant United States Attorney
310 First Street, SW
Room 906
Roanoke, VA 24011
Tel: (540) 278-1471
Fax: (540) 857-2614
Email: Justin.Lugar@usdoj.gov
*Counsel for the United States*

Acting Under Authority Conferred by 28 U.S.C. § 515

COMMONWEALTH OF VIRGINIA

By: ___*/s/ Matthew G. Howells*_________
MATTHEW G. HOWELLS (VSB #88167)
Assistant Attorney General
Virginia Office of the Attorney General
Medicaid Fraud Control Unit, Civil Litigation
202 North 9th Street
Richmond, VA 23219
Tel: (804) 786-6547
Fax: (804) 786-0807
Email: mhowells@oag.state.va.us
*Counsel for the Commonwealth*